Charles S. Barquist (CA State Bar No. 133785)
    cbarquist@mabr.com
Lee Cheng (CA State Bar No. 191380)
    lcheng@mabr.com
Jared J. Braithwaite (CA State Bar No. 288642)
    jbraithwaite@mabr.com
MASCHOFF BRENNAN
300 South Grand Avenue, Suite 1400
Los Angeles, California 90071
Telephone:   (949) 202-1900
Facsimile:    (949) 453-1104

Attorneys for Defendant VIZIO, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| VDPP LLC,<br><br>Plaintiff;<br><br>v.<br><br>VIZIO, Inc.,<br><br>Defendant. | Case No. 8:20-cv-00030-JVS-KES<br><br>**VIZIO, Inc.'s Opening<br>Claim Construction Brief**<br><br>HON. JAMES V. SELNA<br>UNITED STATES DISTRICT JUDGE<br>SANTA ANA, COURTROOM 10C<br><br>Claim Construction Hearing:<br>April 5, 2021 at 3:00 p.m. |

**TABLE OF CONTENTS**

I.   BACKGROUND ..................................................................................1

II.  LEGAL STANDARDS ......................................................................3

     A.   Claim construction makes an objective assessment about how one of
          ordinary skill in the art would have understood the words and scope of
          the claims at the time of the invention. ...........................................3

     B.   System claims stated in functional terms are invalid as indefinite if they
          do not recite sufficient structure for performance of the recited
          functions. ........................................................................................4

III. CONSTRUCTION OF DISPUTED CLAIM TERMS .......................................6

     A.   The "processor" and "storage" terms are means-plus-function terms
          that lack disclosed structure for performance of the recited functions
          and are therefore indefinite. ............................................................6

          1.   The generic computer terms "storage" and "processor" do not
               convey specific structure for performance of the recited
               functions. ..............................................................................7

          2.   The specification of the Asserted Patents fails to describe
               structure for performance of the claimed functions. ...................9

     B.   There is no support in the Asserted Patents for VDPP's interpretation
          of an "image frame" as anything other than a frame. ......................12

     C.   There is no support in the Asserted Patents for VDPP's interpretation
          of "bridge frame" as the absence of a frame. ................................14

     D.   The claims and the specification of the Asserted Patents use the phrase
          "is different from" to refer to image frames with different content as
          opposed to separate, identical image frames. ................................16

     E.   VIZIO drops its request for the construction of "generate a bridge
          frame/blended modified image frame/modified combined image
          frame." ...........................................................................................18

     F.   The claimed function of "displaying" the various types of frames means
          presentation of the frames for perception by a viewer. ...................18

     G.   The term "video stream" in the phrase "obtain a first image frame from
          a first video stream" refers to a sequence of image frames not mere
          images that are not frames. .............................................................20

ii

H.   A "bridge frame [that] is a nonsolid color/a solid color/ or black" must mean that the entire frame is a nonsolid color, a solid color, or back—otherwise the phrase is meaningless. ............................................................21

I.   The specifications of the Asserted Patents specifically define "blending" or "combining" image frames as "superimposition."................22

IV.   CONCLUSION ...............................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*3M Innovative Properties Co. v. Avery Dennison Corp.*,
  350 F.3d 1365 (Fed. Cir. 2003) ................................................. 22

*Aristocrat Tech. Australia Pty Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008) ................................................. 11

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*,
  64 F.3d 1553 (Fed. Cir. 1995) ................................................. 17

*Farstone Tech., Inc. v. Apple Inc.*,
  2015 WL 5898273 (C.D. Cal. Oct. 8, 2015)................................. 8

*GoDaddy.com, LLC v. RPost Commc'ns Ltd.*,
  No. CV-14-00126-PHX-JAT, 2016 WL 212676 (D. Ariz. Jan. 19, 2016),
  *aff'd*, 685 F. App'x 992 (Fed. Cir. 2017)................................... 7

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*,
  302 F.3d 1352 (Fed. Cir. 2002) ................................................. 22

*Konami Gaming, Inc. v. Marks Studios, LLC*,
  2017 WL 3174905 (D. Nev. Jul. 25, 2017) ................................. 5, 8, 11, 12

*Maytag Corp. v. Electrolux Home Prods., Inc.*,
  411 F. Supp. 2d 1008 (N.D. Iowa 2008) ..................................... 12

*O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) ................................................. 12

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................... 3, 4

*Portney v. CIBA Vision Corp.*,
  2009 WL 5064701 (C.D. Cal. Dec. 23, 2009)............................... 13

*Williamson v. Citrix Online, LLC*,
  792 F.3d 1339 (Fed. Cir. 2015) ................................................. *passim*

**Statutes**

35 U.S.C. § 112 ................................................................. 4, 5, 8, 9

In accordance with the Court's schedule,[1] Defendant VIZIO, Inc. respectfully submits its opening claim construction brief regarding the construction of disputed claim terms identified in the Joint Claim Construction and Prehearing Statement.[2]

Plaintiff VDPP LLC has asserted patent infringement claims against VIZIO based on U.S. Patent Nos. 9,699,444 ("'444 Patent," attached as Ex. 1), 9,948,922 ("'922 Patent," attached as Ex. 2), and 10,021,380 ("'380 Patent," attached as Ex. 3) (collectively "Asserted Patents"), which are directed to the creation of optical illusions through the presentation of successive different images to a viewer, including 3D illusions by presentation of different images to each of a viewer's eyes.

VDPP's infringement contentions are limited to claims 1 and 27 of the '444 Patent, claim 2 of the '922 Patent, and claim 6 of the '380 Patent.[3] The parties dispute the meaning of terms used in the asserted claims of the Asserted Patents, some of which are potentially dispositive in this case. VIZIO asks the Court to resolve those disputes, as set forth below, and presents this brief in support of its proposed claim constructions.

## I.    BACKGROUND

Each of the Asserted Patents claims priority back to a provisional patent application filed over 20 years ago on January 23, 2001, and to the first non-provisional patent application, which resulted in Patent No. 7,030,902, entitled "Eternalism, a Method for Creating an Appearance of Sustained Three-Dimensional Motion-Direction of Unlimited Duration, Using a Finite Number of Pictures." This title aptly describes the Asserted Patents, which are directed to the presentation of optical illusions such as the illusion of 3D images using different images provided to each eye of a viewer, or the illusion of continuous movement for stationary pictures using different images—an illusion that the Asserted Patents call an "Eternalism." (*See* '444 Patent at col. 1, lns. 47–56 and col. 4, lns. 31–57.)

---

[1] *See* Docket Nos. 20 and 25.

[2] Docket No. 23.

[3] Claim 27 of the '444 Patent depends from claim 26. Likewise, claim 2 of the '922 Patent depends from claim 1.

Notwithstanding that the Asserted Patents each claim priority to the January 23, 2001 provisional patent application, various material has been added to the disclosure of the Asserted Patents since that time through "continuation-in-part" applications as well as through the addition of new material in continuation applications (even though such additions are improper). For example, among the additions to the disclosure was the 2015 addition to the summary of the invention section directed to the idea of adapting a computer processor and storage to create the illusions. (*See* Ex. 5 hereto, U.S. Patent No. 9,426,452, at col. 10, lns. 4–6 and 43–46, col. 11, lns. 29–31 and lns. 44–46.) But at no time was any substantive addition made about how to actually adapt a computer processor to do so—only the mere idea that it was possible. The words "processor" and "storage" did not appear in the original provisional application (*See* Ex. 4 hereto, U.S. Provisional Application No. 60/263,498.) Between the filing of the application for the '444 Patent and those of the '922 and '380 Patents, the patentee added several figures of generic computer diagrams and several columns of text to the disclosure of the '444 Patent. (*See*, *e.g.*, '922 Patent, Figures 31–59B, cols. 62–64.)

Along the way, the patentee also added disclosure related to the operation of 3D glasses, and each of the Asserted Patents is entitled "Faster State Transitioning for Continuous Adjustable 3Deeps Filter Spectacles Using Multi-Layered Variable Tint Materials." Yet, this case is not about optical illusions or 3D glasses. Instead, VDPP contends that VIZIO's televisions infringe the Asserted Patents. To do so, VDPP has to stretch the interpretation of various claim terms or to advocate for "ordinary meaning" constructions so that it can later argue its interpretations to a jury. As set forth in VIZIO's proposed constructions and citations to the intrinsic record, VDPP's interpretation of the claims runs contrary to the claim terms themselves as well as to the unequivocal use of the terms in the specifications for the Asserted Patents. Accordingly, VIZIO requests adoption of its proposed constructions as those that stay true to the claim language and most naturally align with the specifications of the Asserted Patents.

## II.   LEGAL STANDARDS

**A.   Claim construction makes an objective assessment about how one of ordinary skill in the art would have understood the words and scope of the claims at the time of the invention.**

The purpose of claim construction is to make an objective assessment about what a person of ordinary skill in the art at the time the patent was filed would have understood by the words in the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313, 1316–17, 1321–23 (Fed. Cir. 2005) (en banc).

In interpreting the words of the claims, the focus is on "how the patentee used the claim term in the claims, specification, and prosecution history" (i.e., the intrinsic record). *Id.* at 1321. A patentee often uses words in a claim in the same way as those of ordinary skill in the relevant art, and therefore the words of a claim are "'generally given their ordinary and customary meaning.'" *Id.* at 1312 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90. F.3d 1576, 1582 (Fed. Cir. 1996)). Thus, "[t]he inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id* at 1313.

"[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art . . . as of the effective filing date of the patent application. . . . In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1313–14. In other cases, however, the meaning of a claim term as understood by persons of skill in the art may not be immediately apparent, and additional sources must be consulted to determine what a person of skill in the art would have understood the term to mean; however, additional sources must not be used to "contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1314, 1322–23 (quoting *Vitronics*, 90 F.3d at 1584 n. 6). "Because dictionaries, and especially technical dictionaries, endeavor to

collect the accepted meanings of terms used in various fields of science and technology, those resources have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." *Id.* at 1318.

"Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quoting *Renishaw PLC v. Marposs SpA*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

**B. System claims stated in functional terms are invalid as indefinite if they do not recite sufficient structure for performance of the recited functions.**

The Patent Act gives patentees the option of drafting patent claims using functional terms (what the claimed invention does) without the recital of structure for implementation of the function. 35 U.S.C. § 112(f).[4] When a patentee uses functional language in a patent, the patent specification must disclose what structure, or which devices, can be used to carry out the function. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–48 (Fed. Cir. 2015).

Use of the words "means for" or "step for" create a presumption of functional claiming and that § 112(f) applies. *See id.* at 1348. But "the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* (citing *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996)). "When a claim term lacks the word 'means,' the

---

[4] While the Asserted Patents claim priority to patent applications predating the Leahy–Smith America Invents Act ("AIA"), the AIA's amendments apply to any application filed after September 16, 2012. Pub.L. 112–29 at § 35. Each of the Asserted Patents was filed after that date and the AIA's version of § 112 applies. AIA § 112(f) corresponds to and is substantially similar to § 112 ¶ 6 of the pre-AIA statute.

presumption can be overcome and [§ 112(f)] will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Williamson*, 792 F.3d at 1349 (quoting *Watts v. XL Systems, Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)).

In *Nautilus, Inc. v. Biosig Instruments, Inc.*, the Supreme Court stated that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." 572 U.S. 898, 901 (2014). This requirement for "definiteness" arises out of 35 U.S.C. § 112, which requires that the specification conclude with claims "particularly pointing out and distinctly claiming" that which the inventor regards as the invention. Finding a claim term "indefinite" also leads to finding a claim invalid that incorporates the indefinite term. While issued patents are presumed valid such that invalidity must be proved by clear and convincing evidence, "this presumption of validity does not alter the degree of clarity that § 112, ¶ 2 demands from patent applicants." *Nautilus*, 572 U.S. at 912 n. 10.

Construing a means-plus-function claim term is a two-step process: (1) the court must first identify the claimed function and (2) the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function. *Williamson*, 792 F.3d at 1351. *"Where there are multiple claimed functions … the patentee must disclose adequate corresponding structure to perform all of the claimed functions." Id.* (citing *Noah Sys. Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318–19 (Fed. Cir. 2012)). "If the patentee fails to disclose adequate corresponding structure, the claim is indefinite." *Williamson*, 792 F.3d at 1351 (citing *Noah*, 675 F.3d at 1311–12); *see also Konami Gaming, Inc. v. Marks Studios, LLC*, 2017 WL 3174905, *2 (D. Nev. Jul. 25, 2017).

## III.   CONSTRUCTION OF DISPUTED CLAIM TERMS

**A.   The "processor" and "storage" terms are means-plus-function terms that lack disclosed structure for performance of the recited functions and are therefore indefinite.**

| Term | VDPP's Construction | VIZIO's Construction |
|---|---|---|
| **1.** "a storage adapted to store one or more image frames" | Ordinary meaning | Indefinite |
| **2.** "a storage adapted to store a sequence of images frames" | Ordinary meaning | Indefinite |
| **3.** "a processor adapted to [perform the recited functional limitations]" | Ordinary meaning | Indefinite |
| **4.** "a processor communicably coupled to the storage and adapted to [perform the recited functional limitations]" | Ordinary meaning | Indefinite |

Each of the asserted claims in the Asserted Patents is written in means-plus function form with generic reference to "a storage" and "a processor" "adapted to" carry out a list of functions, which differs for each asserted patent. Yet because the terms themselves are not associated with sufficient structure for performance of each of the claimed functions and because the specifications of the Asserted Patents do not disclose any particular structure for performance of each of the claimed functions, the asserted claims indefinite.

With respect to the particular functions of each asserted claim, claims 1 and 27 of the '444 Patent recite similar functions regarding (1) storage of image frames; (2) obtaining images frames from a video stream; (3) expansion of an image frame to generate a modified image frame; (4) generation of a bridge frame; (5) blending the modified image frame and bridge frame; or (6) display of the modified image frame and bridge frame. Claim 2 of the '922 Patent, which depends from and includes the limitations of claim 1, lists the functions as (1) storage of image frames; (2) obtaining first and second image

frames from a video stream; (3) generation of a first and second modified image frames by expanding first and second image frames; (4) generation of a bridge frame; (5) display of the first modified image frame, bridge frame, and second modified image frame. Claim 6 of the '380 Patent recites the functions as (1) storing a sequence of image frames; (2) obtaining first and second image frames from the sequence of image frames; (3) expanding the first and second image frames to generate modified first and second image frames; (4) combining the modified first and second image frames to generate a modified combined image frame; (5) display of the modified combined image frame.

As set forth below, the claims themselves do not set forth sufficient structure for a storage or a processor to perform the above-listed functions, and the specification fails to describe how to adapt a storage and processor to perform of the functions. As a result, the claims are indefinite as impermissible and purely functional claims.

**1.    The generic computer terms "storage" and "processor" do not convey specific structure for performance of the recited functions.**

There is a rebuttable presumption that claim terms that do not use the word "means" are not means-plus-function terms. *Williamson*, 792 F.3d at 1348. However, "[g]eneric terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke § 112, para. 6." *Id.* at 1350 (quoting *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006)). The generic computer terms "storage" and "processor" as used in the claims of the Asserted Patents are similarly nonce words that stand in as "means" terms for performance of the recited functions. *See GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, No. CV-14-00126-PHX-JAT, 2016 WL 212676, at *56 (D. Ariz. Jan. 19, 2016) (finding 'processor' subject to interpretation as means-plus-function because "the claimed 'processor' and other claim language does not convey to a skilled artisan anything about the internal components, structure, or specific operation of the processor."), *aff'd,* 685 F. App'x 992 (Fed. Cir.

2017); *see also Farstone Tech., Inc. v. Apple Inc.*, 2015 WL 5898273, *3–4 (C.D. Cal. Oct. 8, 2015) (finding "processing system" subject to interpretation as means-plus-function). The asserted claims do not describe how the "storage" or "processor" carry out the recited functions—only that they do. Thus, they only stand to set up a black box for performance of a function without any description of how such a function is performed.

The Federal Circuit in *Williamson* addressed this same issue. 792 F.3d 1339. There, the claim term was "distributed learning control module." *Id.* at 1349–50. In the claims, the "control module" acted as a stand in for "means" by appearing only for the purpose for reciting a lengthy list of functions. *Id.* The listing of inputs and outputs for the "control module" also did not describe how it interacted with other components on more than a superficial level sufficient to provide any meaningful structural description. *Id.* at 1351. Not even expert testimony from the patentee's expert that he would know exactly how to program a computer to perform the recited functions was enough because "the fact that one of skill in the art could program a computer to perform the recited functions cannot create structure where none otherwise is disclosed." *Id.* (citing *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013)).

In *Konami,* the District Court also noted that while common computer terms such as "processor" refer to a physical device, so does the term "device" itself. 2017 WL 3174905, *3 (D. Nev. Jul. 25, 2017). The question is not whether something physical is recited in the claim but rather whether the claims recite sufficient structure for performance of the recited functions. *Id*. at *3–4. In recognition of multiple decisions interpreting recitations to general processors and processing means under § 112(f), the court in *Konami* noted that the term "game controller" was no more than a stand-in for "means" or a generic processor to perform recited computer functions. *Id.* (citing *Williamson*, 792 F.3d 1339, 1347–53.)

Accordingly, because the claim terms "storage" and processor" are not associated with any particular structure to perform the recited functions, they act as mere nonce

words that should be interpreted as means-plus-function terms in accordance with § 112(f).

### 2. The specification of the Asserted Patents fails to describe structure for performance of the claimed functions.

Much of the language in the asserted claims is unique to the claims themselves or barely referenced in the specification. This is especially true with respect to any structure for a "storage" and a "processor" for performing the functions as recited in the asserted claims.

In fact, the words "storage" and "processor" are not used in the underlying provisional application to which VDPP asserts the Asserted Patents are entitled to priority. (Ex. 4 hereto, U.S. Provisional Application No. 60/263,498.) These terms did not appear in the patent family for the Asserted Patents until the filing—some 14 years later—of the immediate predecessor to the '444 Patent, U.S. Application No. 14,850,750, filed September 10, 2015, issued as U.S. Patent No. 9,426,452. Even then, the terms were only nominally included as redundant recitations of the claims in the "Summary of the Invention" section of the specification. (*See* Ex. 5 hereto, U.S. Patent No. 9,426,452, at col. 10, lns. 4–6 and 43–46, col. 11, lns. 29–31 and lns. 44–46.). These nominal recitations are also the only such recitations in the specifications for the '444 Patent. ('444 Patent at col. 10, lns. 18–21 and lns. 58–61, col. 11, lns. 42–46 and lns. 58–61.) The specification of the '444 Patent makes a limited reference to "storage" for synchronization signals—not in connection with storage of video or image frames. ('444 Patent at col. 23, lns. 29–39.) The '444 Patent is completely devoid of description of the structure for storage or a processor that performs the recited functions.

The asserted claims of the '444 Patent provide a list of functions for the storage and processor: (1) storage of image frames; (2) obtaining images frames from a video stream; (3) expansion of an image frame to generate a modified image frame; (4) generation of a bridge frame; (5) blending the modified image frame and bridge frame and (6) display of the modified image frame and bridge frame. But the specification for the '444 Patent

does not describe structure for a storage and a processor for performance of these functions. At most, the specification, like the claims, only says that the functions are performed—not how the storage or processor performs them.

For the '922 and '380 Patents, the '922 Patent is based on a continuation-in-part application, filed on May 26, 2017, that added several figures of generic computer diagrams and several columns of text to the disclosure of the '444 Patent. (*See*, *e.g.*, '922 Patent, Figures 31–59B, cols. 62–64.) And the '380 Patent also shares this additional disclosure.

Importantly, VDPP contends that the asserted claims of the '922 and '380 Patents are entitled to priority and find their support in the provisional application filed on January 23, 2001. (Ex. 6 hereto, VDPP's infringement contentions at 2.) Accordingly, the claimed storage and processor should not find their support in the material added to the specification in the '922 and '380 Patents—at least not according to VDPP.[5]

Yet even if this additional material in the specifications of the '922 and '380 Patents is considered, it still fails to recite sufficient structure for performance of the functions recited in the asserted claims of the '922 and '380 Patents. The added figures only refer to the processor and storage as no more than mere "black boxes," with no description of their structure or operation to perform each of the functions recited in the asserted claims of the '922 and '380 Patents. (*See*, *e.g.*, Figures 31, 36, 57 of the '922 and '380 Patents.)

And the flow charts are no more than recitation of the functions—they do not disclose a structural algorithm for performance of the functions, i.e., a description of how the function is achieved. (*See*, *e.g.*, Figures 32, 58–59B of the '922 and '380 Patents.) For example, the asserted claims of the '922 and '380 Patents each recite the functions of generating modified image frames through expansion of other video frames. But neither the original disclosure in the provisional patent application to which priority is claimed

---

[5] If VDPP relies on the material added to the specification after the filing of the provisional patent application in January 2001, then the Court should also find that the such reliance entitles the applicable claims to a priority date no earlier than the added material.

nor any additional disclosure added since explains how the processor performs the recited expansion. Even for the function of generating bridge frames, which the specification purports to show in Figures 34A–35B, the specification, like the claims, only says that the function is performed—not how the processor performs it. ('922 Patent at col. 62, lns. 42–50.)

The asserted claims are directed to "an apparatus" that performs the specified functions. But the specifications of the Asserted Patents do not include a description of any apparatus that performs each and every function as recited in the asserted claims. And simple reference to generic or general-purpose computers does not suffice. *Aristocrat Tech. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("For a patentee to claim a means for performing a particular function and then to disclose only a general-purpose computer as the structure designed to perform that function amounts to pure functional claiming.") "Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function." *Id.* (quoting § 112).

*Williamson* and *Konami* similarly found insufficiently disclosed structure to claimed processing components to perform recited functions. In *Williamson*, the patentee argued that reference to a general-purpose computer or disclosures in the specification reciting the functions provided sufficient structure for the claims. 792 F.3d at 1352–53. The Federal Circuit disagreed noting that special functions require "more than simply a general-purpose computer or microprocessor," and that general references to a claimed function in the specification are not "an algorithm for performing the claimed functions." *Id.* In *Konami*, the court noted that "Konami's patents teach a processor that performs computer functions like 'initiating' a game and 'determining' symbols, but they provide no information about how that processor is programmed to carry out these functions or how it is configured to interact with other parts of the machine to operate. And that is

exactly the sort of 'black box' means claiming that *Williamson* warned of." *Konami* 2017 WL 3174905, *6 (D. Nev. Jul. 25, 2017). Thus, in both *Williamson* and *Konami*, the claims were found invalid because the specifications for the underlying patents failed to disclose sufficient structure for the performance of the claimed functions. *Id.* at *7–8; *Williamson*, 792 F.3d at 1354.

The claimed functions of the Asserted Patents similarly lack sufficient disclosure of structure for performance of the claimed methods and should be similarly held invalid as indefinite.

**B.   There is no support in the Asserted Patents for VDPP's interpretation of an "image frame" as anything other than a frame.**

| Term | VDPP's Construction | VIZIO's Construction |
|------|---------------------|----------------------|
| **5.** "image frame" | Ordinary meaning | "perceptible and complete image[s] of the full span of the entire frame" |

The term "image frame" appears in each of the asserted claims, and the parties' dispute regarding the interpretation of the term is about whether a frame is what it says— a frame—or whether an image frame can be something less, such as a mere image within the frame. While VDPP asserts only that "image frame" should carry its ordinary meaning, that begs the question about what VDPP believes the ordinary meaning is. VIZIO asserts that its proposed construction is the ordinary meaning. Accordingly, the question for the Court is which "ordinary meaning" is correct in light of the claims and specification for the Asserted Patents. *See Maytag Corp. v. Electrolux Home Prods., Inc.*, 411 F. Supp. 2d 1008, 1037 (N.D. Iowa 2008) ("[P]arties in patent cases rarely agree on the 'ordinary meaning…' so that asserting that such a meaning should apply, without further construction, merely begs the question of what that meaning is.")

"A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co.*, 521 F.3d 1351, 1361 (Fed.

Cir. 2008). Thus, "[i]t is permissible during claim construction to focus on the aspects of the claims that matter for the determination of whether the claims cover the accused product." *Portney v. CIBA Vision Corp.*, 2009 WL 5064701, *5 (C.D. Cal. Dec. 23, 2009) (citing *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1327 (Fed. Cir. 2006)).

VDPP's infringement contentions assert VIZIO's television infringe through "local dimming" (i.e., dimming part of the image frame as part of video processing). VIZIO asserts that an interpretation of "frame" to be an image within an image frame or to be anything other than a frame is inconsistent with the meaning of that term as used in the claims and in the specification of the Asserted Patents. VDPP apparently disagrees but failed to point to any support in the specification for its interpretation. (*See* Docket No. 23-1, Joint Claim Construction Statement Attachment A, at 6.)

An image or picture "frame" is a familiar term in lay usage and connotes an entire or complete image or picture. The specification for the Asserted Patents uses the term in the same way and no special meaning is given to "frame" in the context of the Asserted Patents. For example, the specification describes movies or video as a "series of single pictures [that] are positioned in adjacent picture frames…." ('444 Patent, col. 3, lns. 38–51.) And when the specification refers something less than or smaller than a frame, such as an "image picture [that] need not fill the picture frame," or "images [that] need not necessarily filling up the entire frame," it distinguishes mere images or pictures from an image "frame." ('444 Patent, col. 6, lns. 21–26.) Rather, the specification notes that "more than one image picture can be employed per frame" or "the picture frame can contain a cluster of images [such that] the image or images [in the frame] need not necessarily fill[] up the entire frame." (*Id.*) Such statements are in accordance with the ordinary usage of the word "frame." For video or a movie, a frame is the entire or complete frame. There is no support in the specification or claims for VDPP's apparent position that a "frame" can be a mere image from the frame or something other than a frame for a video or movie.

Accordingly, VIZIO requests that the Court adopt its construction for "image frame" as reflecting the ordinary meaning of that term as used in the Asserted Patents.

## C. There is no support in the Asserted Patents for VDPP's interpretation of "bridge frame" as the absence of a frame.

| Term | VDPP's Construction | VIZIO's Construction |
|------|---------------------|----------------------|
| **6.** "bridge frame" | "a gap or interval between image frames, including an unlit screen" | "perceptible and complete image of the full span of the entire frame between two other perceptible and complete images of the full span of the entire frame" |

The term "bridge frame" is used in the asserted claims of the '444 and '922 Patents. The parties' dispute regarding the interpretation of bridge frame raises two issues: (1) whether a frame can be a mere image within the frame or something other than a frame and (2) whether a frame has to be anything at all or whether it can be the absence of an image.

These interpretation issues arise, again, because VDPP's infringement contentions assert that VIZIO's televisions infringe through the imperceptible absence of an image, for example, "local dimming" (i.e., dimming or turning off the backlight that illuminates part of an image frame as part of video processing).

Resolution of whether a frame can reference something other than a frame, for example, an image within a frame, is the same issue presented in connection with the "image frame" term. And the meaning of "frame" in ordinary usage and in the specification refers to an entire or complete image. VDPP has no support for the position that a "frame" is anything less.

Furthermore, regarding whether a "bridge frame" needs to be anything at all, the patent claims themselves show that a "bridge frame" is affirmatively its own frame with image information, as opposed to the absence of a projected image. Specifically, claim 1 of the '444 Patent recites that the bridge frame is generated, the bridge frame "*is* a non-solid color," and the bridge frame is blended with a modified image frame. In claim 27 of

the '444 Patent, the bridge frame is also generated and "*is* a solid color," specifically, "the bridge frame is black," and the bridge frame is displayed. Likewise, claim 2 of the '922 recites that the bridge frame is generated, is black and is displayed. The absence of a frame or non-display of an image frame by turning off the light, is not generation of a bridge frame that affirmatively is claimed to have a color, even if that color is black. And a bridge frame must be itself an image if it is to be "blended" or "displayed."

As noted before, the specifications of the Asserted Patent are directed to optical illusions, and the specifications describe purposeful display of a black bridge frame to create the illusions. Specifically, the specification notes that the illusion of continuous movement can be created by showing animated frames followed by the purposeful display of a bridge frame for a "flicker" effect. ('444 Patent at col. 39, ln. 59 – col. 40, ln. 28 ("The present invention purposefully makes flicker apparent, utilizing the effects of emphatic flicker on the human optical/nervous systems to create uncanny time and space illusions."); *id.* at Figures 23–25 and col. 42, lns. 19–41 (noting the use of bridge frames to create the illusion).)

The specification separately describes a bridging interval as potentially a perceptible "unlit-screen pause" to create the intended illusions. But the "unlit-screen pause" is not referred to as a "frame," and is contrasted with a bridging picture that "*is*" black or a strongly-contrasting image. ('444 Patent at col. 4, lns. 43–57 (emphasis added).) For example, Figures 23–25 illustrate a black "bridge frame," which is the literal insertion of a black frame in a series of frames, as if in a film strip. (*See also* '444 Patent at col. 42, lns. 19–41 (describing Figures 23–25).) Thus, in contrast to a bridging interval such as an unlit-screen pause, an actual "frame" of video is created for a "bridge frame."

From both the claims and the specification, one of skill in the art would understand that the bridge frame is perceptible and "*is*" a solid or non-solid color as opposed to merely an unlit screen, because the claims require that the "bridge frame" be displayed. One of skill in the art would also understand a bridge frame that is a solid or non-solid color, for example black, would be the entire frame and not just an image within a frame

that is black. VDPP's interpretation of "bridge frame" as an imperceptible lack of display runs contrary to the language of the claims and the use of the term in the specification.

Accordingly, VIZIO requests that the Court adopt its construction for "bridge frame" as most naturally aligning with the meaning of that term as used in the Asserted Patents.

**D.   The claims and the specification of the Asserted Patents use the phrase "is different from" to refer to image frames with different content as opposed to separate, identical image frames.**

| Term | VDPP's Construction | VIZIO's Construction |
|------|---------------------|----------------------|
| **7.** "is different from" | Ordinary meaning | "has dissimilar images elements or repositioned image elements" |

The phrase "is different from" appears in each of the asserted claims in the context of the image frames being different from each other or the bridge frames being different from the image frames. The parties' apparent dispute regarding the interpretation of the phrase is about whether "different" images means, as VIZIO contends, different in appearance or content, or as VDPP appears to contend, different as separate instances of the same image, or images that appear the same but are of a different size.

Again, VDPP asserts only that "is different from" should carry its ordinary meaning, which again does nothing to say what VDPP believes that ordinary meaning is. But it appears from VDPP's infringement contentions that VDPP contends that two frames with the same image content can nonetheless be different as long as they are separate instances of a frame with the same image, whether or not the instances are the same size. VIZIO asserts that such an interpretation is contrary to the language of the claims themselves and contrary to the meaning of "different" in the context of the Asserted Patents.

Starting with the language of the claims, the asserted claims inherently recite separate frames for each of the frames that are claimed as "different from" each other. For example, claim 1 of the '444 Patent recites the function of "expand[ing] the first image frame to generate a modified image frame, wherein the modified image frame is different from the first image frame." Under VDPP's apparent construction that different only

means separate instances of the same image, the requirement that the first image frame be different from the modified image frame would be redundant because the first image frame and modified image frame are already described as two separate image frames that have two separate sizes, the "first" size and an "expanded" size.  But the claim adds an additional characteristic, that the modified frame is not merely expanded but also "different." In order to give the phrase meaning, "is different from" must refer to a difference in content. *See Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) (a court "must give meaning to all the words in [the] claims.").

The specifications of the Asserted Patents also note that separate frames may be the same and that "different" frames are those different in content. For example, the specification describes the creation of its illusions through repetition of the same sequence of frames as either a repeating cycle or through duplication of the same image frames to create different image rhythms. ('444 Patent at col. 5, lns. 22–29.) The specification also notes that separate frames may include the "same" image elements. (*Id.* at col. 6, lns 27–42.) If "different" meant only that there were separate instances of the image frames, then picture elements in separate frames could not be described as the "same" because even though showing the same content, they would be separate image elements and thus, in VDPP's view, "different." (*See also* '444 Patent at col. 13, lns. 33–35 (describing separate frames as "identical"); *id.* at col. 16, lns. 1–12 (noting that the illusion is not achieved if both eyes receive the same image; '380 Patent at col. 107, lns. 17–27 ("a plurality of bridge frames that are visually dissimilar to the image frame are generated").)

Accordingly, in light of the language in the asserted claims themselves and the specification, the phase "is different from" when referring to two separate image frames most naturally refers to images that are different in terms of their content, i.e., having dissimilar image elements or repositioned image elements. VDPP's apparent interpretation of renders claim language null because the separate instances of image frames are inherently separate. VDPP's interpretation also finds no support in the

specification because the specification clearly states that separate frames may not be different but may rather be identical. (*See*, *e.g.*, '444 Patent at col. 13, lns. 33–35 (noting that frame G and H "are identical" in Figures 22a–22c).) VIZIO, therefore, requests that the Court adopt its construction for "is different from" as most naturally aligning with the ordinary meaning of that term as used in the Asserted Patents.

**E.  VIZIO drops its request for the construction of "generate a bridge frame/blended modified image frame/modified combined image frame."**

| Term | VDPP's Construction | VIZIO's Construction |
|---|---|---|
| **8.** "generate a bridge frame/blended modified image frame/modified combined image frame" | Ordinary meaning | Plain and ordinary meaning as written in the claims. |

The parties' Joint Claim Construction Statement identified the phrase "generate a bridge frame/blended modified image frame/modified combined image frame" as in need of construction. Based on the other claim construction issues addressed herein, VIZIO withdraws its request for the Court to construe this phrase. Thus, the parties appear to be in agreement that the phrase is not in need of construction by the Court, other than the construction of individual terms "image frame" and "bridge frame" within this phrase, as noted above.

**F.  The claimed function of "displaying" the various types of frames means presentation of the frames for perception by a viewer.**

| Term | VDPP's Construction | VIZIO's Construction |
|---|---|---|
| **9.** "display the blended modified image frame/bridge frame/modified combined image frame" | Ordinary meaning | "presentation of the [blended modified image frame/bridge frame/modified combined image frame] for perception by a viewer" |

All of the asserted claims require "display" of a bridge frame, blended modified image frame, or modified combined image frame. The parties' dispute regarding the interpretation of this phrase appears to center on the meaning of "display." VDPP, again, forgoes providing any explanation about what it believes the ordinary meaning of display is, but VDPP appears to interpret the phrase to include non-display of frames, which is entirely counter to the ordinary meaning. In particular, VDPP accuses VIZIO's televisions of infringement through "local dimming," which is imperceptibly reducing the LED backlight brightness for a short period in certain zones on the television.

VIZIO asserts that display means the actual presentation of a frame so that the user may perceive the displayed frame—as opposed to interrupting the display or adjusting the brightness of the LED backlighting. VIZIO's proposed construction is not that a person viewing the display would need to appreciate each difference in each displayed frame, as the illusion of video is perception of the still image frames in sequence to create the illusion of motion. But the displayed frames are, nevertheless, presented to the viewer and perceived in order to create that illusion.

The specification uses "display" in the same sense of both (1) presentation and (2) for perception. Specifically, "display" is affirmative presentation. The specification notes, for example, that the use of "shutters" on old movie projection equipment is used to "interrupt the display" of each movie frame. This interruption of display was known as "flicker" when the interruption was too long. ('444 Patent at col. 40, lns. 9–28.) The specification also notes that its illusions are created by purposefully causing a flicker-like effect through actual display of a bridge frame, i.e., solid color frames, black frames, and the like. (*Id.* at col. 40, lns. 25–39.) Thus, the "display" of a bridge frame is actually presented (e.g., projected) as opposed to a mere interruption of a display, and the display of the bridge frame is meant to be perceived as a subtle flicker-effect as opposed to imperceptible interruptions of display cause by a projection shutter, for example.

Accordingly, the "display" of the claimed type of frame is just what it says it is—presentation of the frame for perception by the audience of the display. VIZIO, therefore, requests that the Court adopt its construction for this phrase.

**G.** **The term "video stream" in the phrase "obtain a first image frame from a first video stream" refers to a sequence of image frames not mere images that are not frames.**

| Term | VDPP's Construction | VIZIO's Construction |
|---|---|---|
| **10.** "Obtain a first image frame from a first video stream" | "obtain a first image frame from a sequence of moving visual images" | "obtain a first image frame from a collected sequence of image frames" |

The subtle difference between the parties' interpretations is whether "obtain[ing] a first image frame" is obtaining the frame from a video stream or whether it includes obtaining something other than a frame, such as an image within the frame, from the sequence of image frames comprising a video stream. The specification of the '922 Patent notes that "a video stream is a sequence of video frames;" it is not simply a sequence of images that are not frames. ('922 Patent at col. 60, lns. 40–53.) And neither the specification nor VDPP explain how the claimed invention could possibly construct an image frame merely from images that are not frames.  Thus, as set forth in connection with the "image frame" term, the claims and specification do not align with an interpretation of "frame" as an image within a frame but not a frame itself. VDPP's various proposals that attempt to allow it to proceed in its interpretation of "frame" as non-frames should be rejected. VIZIO, therefore, requests adoption of its proposed construction.

**H.  A "bridge frame [that] is a nonsolid color/a solid color/ or black" must mean that the entire frame is a nonsolid color, a solid color, or back—otherwise the phrase is meaningless.**

| Term | VDPP's Construction | VIZIO's Construction |
|------|--------------------|--------------------|
| **11.** "bridge frame is a nonsolid color/a solid color/black" | Ordinary meaning | "entire image of the bridge frame consists of [a non-solid color/a solid color/black] image" |

The parties' dispute regarding interpretation of the phrase "bridge frame is a nonsolid color/a solid color/black" is essentially encompassed in the dispute over interpretation of the term "bridge frame" itself. VDPP asserts that the bridge frame does not have to be anything at all, including even the absence of a displayed frame.

As set forth in connection with the "bridge frame" term, the claims themselves and the specification are inconsistent with VDPP's interpretation. One of skill in the art would understand that the bridge frame "*is*" a solid or non-solid color as opposed to an unlit screen because the claims require that the "bridge frame" be displayed. Additionally, the specific dispute on this term appears to be whether the entire bridge frame is as described or whether only a portion needs to be a non-solid color, a solid color, or black. If VDPP's interpretation is that only a portion needs to be as described, then the claim language is rendered meaningless. For example, if the claim specifies that the bridge frame "is a solid color," but some portion of the bridge frame (i.e., less that the entirety of the bridge frame) can nevertheless not be a solid color, then the bridge frame ceases being a solid color and the limitation of "a solid color" becomes meaningless. Similarly, if the bridge frame "is black" but some portion of the bridge frame is not black, the bridge frame is not black.

VDPP's apparent interpretation that only a portion (e.g., a single pixel) of a bridge frame needs to be a non-solid color, solid color, or black in order to be considered non-solid color, solid color, or black finds no support in the specification or claims, and the Court should adopt VIZIO's construction.

## I.  The specifications of the Asserted Patents specifically define "blending" or "combining" image frames as "superimposition."

| Term | VDPP's Construction | VIZIO's Construction |
|---|---|---|
| **12.** "blend the modified image frame with the bridge frame to generate a blended modified image frame" | Ordinary meaning according to claim language, "blend the modified image frame with the bridge frame to generate a blended modified image frame" | "superimpose or merge the images of the modified image frame and the bridge frame to produce a blended image over the full span of the entire frame" |
| **13.** "a modified combined image frame" | "the product of the modified first image frame and the modified second image frame" | "optical combination by merging or superimposition of the modified first image frame and the modified second image frame" |

The phrase "blend the modified image frame with the bridge frame to generate a blended modified image frame" appears in claim 1 of the '444 Patent, and the term "a modified combined image frame" appears in claim 6 of the '380 Patent. The question is what does it mean to "blend" or "combine" image frames, and the answer is expressly defined by the named inventor in the specifications of the Asserted Patents. Specifically, "the term 'blending' as used in the specification and claims can also be called superimposing, since one picture is merged with the other picture." ('444 Patent at col. 5, lns. 44–46; '380 Patent at col. 9, lns. 60–62.) The specification also refers to this blending as images that are "optically combined." ('380 Patent at col. 46, lns. 46–59.) The specifications' explicit definition prevails over other possible definitions. *See 3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003); *Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1360–61 (Fed. Cir. 2002) ("Where, as here, the patentee has clearly defined a claim term, that definition usually is dispositive; it is the since best guide to the meaning of a disputed term.")

VDPP's proposed constructions appear to be an attempt to give a definition beyond the explicit definition of the patentee and should be rejected in favor of VIZIO's proposed construction.

## IV.   CONCLUSION

For the foregoing reasons, the Court should adopt VIZIO's proposed constructions and reject VDPP's proposed constructions.

Dated: February 22, 2021          MASCHOFF BRENNAN

                                    By:   */s/ Jared J. Braithwaite*
                                          Charles S. Barquist
                                          Lee Cheng
                                          Jared J. Braithwaite

                                          Attorneys for Defendant VIZIO, Inc.